In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 18-3216

LAW OFFICES OF DAVID FREYDIN, P.C.
and DAVID FREYDIN,

*Plaintiffs-Appellants,*

*v.*

VICTORIA CHAMARA, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-08034 — **Harry D. Leinenweber**, *Judge.*

_____

SUBMITTED SEPTEMBER 9, 2021[*] — DECIDED JANUARY 28, 2022

_____

Before KANNE, HAMILTON, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal presents issues un-
der Illinois defamation law as applied to negative reviews
posted on a business's social media pages. The first issue is
whether any of the reviews contained statements that are

_____

[*] We granted the parties' joint motion to waive oral argument for this case.

actionable as libel per se under Illinois law. They did not; each statement was an expression of opinion that could not support a libel claim. Second, plaintiffs did not allege viable claims for civil conspiracy because plaintiffs have not linked their civil conspiracy claims to an independently viable tort claim. Third, plaintiffs have not shown that the district court erred by not allowing them to amend their complaint. Plaintiffs did not explain how they thought they could cure the problems with their complaint until their appellate reply brief, which was much too late. We affirm the district court's dismissal of this action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

I.  *Factual Background*

   A.  *The Facebook Post and the Responding Reviews*

On a late September day in 2017, David Freydin, a Chicago lawyer, posed a question on Facebook: "Did Trump put Ukraine on the travel ban list?! We just cannot find a cleaning lady!" After receiving online criticism for this odd and offensive comment, Freydin doubled down in the comments section:

> My business with Ukrainians will be done when they stop declaring bankruptcies. If this offends your national pride, I suggest you look for underlying causes of why 9 out of 10 cleaning ladies we've had were Ukrainian and 9 out of 10 of my law school professors were not. Until then, if you don't have a recommendation for a

> cleaning lady, feel free to take your comments somewhere else.[1]

As sometimes happens on social media, things escalated quickly. People angered by Freydin's comments went to his law firm's Facebook, Yelp, and Google pages. They left reviews that expressed their negative views of Freydin. These reviews ranged from simple one-star ratings to detailed comments about Freydin's "hatred and disrespect towards the Ukrainian nation…."

Defendant Victoria Chamara's one-star rating contained the longest commentary. Chamara called Freydin an "embarrassment and a disgrace to the US judicial system," referred to his comments as "unethical and derogatory," and labeled him a "hypocrite," "chauvinist," and "racist" who "has no

---

[1] This comment and Freydin's initial question are not included in plaintiffs' complaint. We may still consider them in reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Parts of the complaint referred to these comments. For instance, one review left by a defendant said: "His unethical and derogatory comments, which target one particular nation–Ukrainians, show who he really is …. He does not hide his hatred and disrespect towards the Ukrainian nation on his personal FB page." Given this reference and others, we include Freydin's comments for the sake of completeness. Just as a plaintiff cannot prevent a court from considering parts of a contract that doom her claim by including in the complaint only the parts of a contract that support her side, a party's selection of part of a chain of communication does not prevent the court from considering the entire chain. Cf. *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 809 n.2 (7th Cir. 2018) (in reviewing grant of motion to dismiss, "we cannot consider in isolation just those contractual provisions that plaintiffs find helpful"); Fed. R. Evid. 106 (rule of completeness). In addition, plaintiffs did not object on appeal to the consideration of these two comments by Freydin, and even incorporated the comments in their reply brief.

right to practice law." Other defendants were more concise. Defendant Tetiana Kravchuk said that Freydin "is not professional" and "discriminates [against] other nationalities," and she told people not to "waste your money," while defendant Anastasia Shmotolokha wrote that "Freydin is biased and unprofessional attorney." These statements from Kravchuk and Shmotolokha also accompanied one-star ratings. Defendant Nadia Romenets gave the Law Offices of David Freydin a one-star rating but did not provide any additional comments. And various one-star ratings from John Doe defendants complained of "terrible experience," "awful customer service," "disrespect[]," and "unprofessional[ism]." None of the defendants had previously used Freydin's legal services.

B. *Procedural History*

Freydin and his law firm sued defendants for these comments and reviews under several legal theories, none of which the district court found viable. Those theories encompassed five torts under Illinois state law: (1) libel per se, (2) "false light," (3) tortious interference with contractual relationships, (4) tortious interference with prospective business relationships, and (5) civil conspiracy. Each theory faced significant hurdles to relief. The district court granted the defendants' motion to dismiss all claims.

On the libel theory, the court deemed the comments "defamatory per se" because they fell under the per se category of "prejudice to a person in his profession." But since the comments were all opinions, they all had the benefit of an affirmative defense and were not actionable under the First Amendment. The next three claims were unsuccessful because essential elements of the claims were missing. Plaintiffs did not allege specific damages necessary for false light invasion of

privacy. For tortious interference with contractual and business relationships, plaintiffs did not identify contracts or prospective business relationships damaged by defendants' actions. Plaintiffs' civil conspiracy claims failed because they were not supported by any independent tort. The district court dismissed the complaint but did not enter judgment and dismiss the civil action itself.

Two weeks later, plaintiffs filed a motion asking the district court to clarify whether the dismissal was with or without prejudice. If it was without prejudice, plaintiffs sought the opportunity to amend the complaint to remedy the deficiencies. Plaintiffs did not attach a copy of an amended complaint to the motion to clarify or indicate how an amended complaint would remedy the deficiencies. At a status hearing on the motion, plaintiffs' lawyer said more of the same, with only a slight alteration: he added that plaintiffs wanted to "amend our pleading" with information from a parallel state court action that would "add some … additional factual allegations." Again, plaintiffs did not indicate what those additional factual allegations would entail.

At the status hearing, the district judge denied plaintiffs' request to amend the complaint. He said: "I think that this case should end now, so the motion is denied." The judge later clarified in a written docket entry that this decision on the motion to amend was the final decision that started the clock for filing a timely appeal. The district court never issued a separate Rule 58 final judgment ending the case.

Plaintiffs Freydin and his law firm now appeal the district court's dismissal of their claims for libel per se and civil conspiracy, and they challenge the denial of their motion to amend the complaint.

II. *Appellate Jurisdiction*

Before reaching the merits, we must address our appellate jurisdiction. "The lack of a separate, final Rule 58 judgment makes the appellate jurisdiction picture messier than necessary." *Sterling National Bank v. Block*, 984 F.3d 1210, 1216 (7th Cir. 2021). Federal Rule of Civil Procedure 58(a) requires: "Every judgment and amended judgment must be set out in a separate document …." As a formal matter, a separate Rule 58 judgment "keeps jurisdictional lines clear." *Wisconsin Central Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 854 (7th Cir. 2018). But it is not a "prerequisite to appealing" if "the judgment really is final within the meaning of 28 U.S.C. § 1291." *Borrero v. City of Chicago*, 456 F.3d 698, 699–700 (7th Cir. 2006). A judgment is final within the meaning of 28 U.S.C. § 1291 "if the district court has otherwise indicated its intent to finally dispose of all claims." *Wisconsin Central*, 894 F.3d at 854; see also *Chase Manhattan Mortgage Corp. v. Moore*, 446 F.3d 725, 726 (7th Cir. 2006) ("The test is not the adequacy of the judgment but whether the district court has finished with the case.").

Here, the district judge signaled sufficiently his intent to be finished with this case. For one, when ruling on the motion to amend at the status hearing, he said: "I think that this case should end now, so the motion is denied." He continued: "as of right now, I'll dismiss [the case] with prejudice as of now so that—just to clarify your appeal period." The docket entry summarizing these proceedings said: "Plaintiff's request to file an amended complaint is denied. Plaintiff's complaint is dismissed with prejudice as of September 26, 2018," which was the date of the status hearing. The reference to dismissal of the complaint rather than the entire civil action was imprecise, but all of these statements, together with the district

court's earlier opinion granting the motion to dismiss, lead us to the "common sense conclusion that the district court intended to enter a final judgment." *Sterling National Bank*, 984 F.3d at 1216 (internal quotation marks omitted). We have jurisdiction over this appeal.

III. *The Motion to Dismiss*

Turning now to the merits, we review de novo a grant of a motion to dismiss for failure to state a claim. *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain enough factual content to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In *Iqbal*, the Court emphasized that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. We review the complaint in the light most favorable to plaintiffs and accept all well-pleaded facts as true. *Huon v. Denton*, 841 F.3d 733, 738 (7th Cir. 2016). This case falls within the federal courts' diversity jurisdiction over state-law claims since the parties served with process satisfy the complete-diversity and amount-in-controversy requirements, see 28 U.S.C. § 1332, and Illinois law governs. *Huon*, 841 F.3d at 738 (applying Illinois law to defamation claim in federal diversity action). We first address the plaintiffs' claims for libel per se and then their civil conspiracy claims.

A. *Libel Per Se*

To state a claim for defamation, a "plaintiff must present facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Solaia Technology, LLC v. Specialty Publishing Co.*, 852 N.E.2d 825, 839 (Ill. 2006). There are five categories of statements that are defamatory per se, where harm or damages are presumed without specific proof. Those are words imputing to a person: (1) commission of a crime, (2) a "loathsome communicable disease," (3) a person's inability to perform or lack of integrity in performing employment duties, (4) adultery or fornication, and last, (5) that the person lacks ability in his profession or the words otherwise prejudice the person in his profession. *Id.* If a statement falls into any one of those categories, it is considered defamatory per se. Here, all the reviews in question fall under the fifth category—prejudice to a person in his profession—and the district court correctly deemed them defamatory per se.

A statement may be defamatory per se and still not be actionable if an affirmative defense applies. Illinois law has four affirmative defenses, one of which is relevant here: the expression of an opinion. See, e.g., *Solaia Technology*, 852 N.E.2d at 839 (a defamatory per se statement "may enjoy constitutional protection as expression of opinion"). Defendants assert that all of their comments were statements of opinion that are not actionable. We agree.[2]

---

[2] Since we agree with defendants that their comments are non-actionable statements of opinion, we decline to decide whether any of their comments are protected under the innocent-construction rule.

B. *Statements of Opinion*

The comments made by defendants are not actionable because they were statements of opinion. Whether a statement is an opinion or assertion of fact is a question of law. *Moriarty v. Greene*, 732 N.E.2d 730, 740 (Ill. App. 2000), citing *Owen v. Carr*, 497 N.E.2d 1145, 1148 (Ill. 1986). To aid in this legal determination, courts ask: (1) whether the statement "has a precise and readily understood meaning;" (2) whether the statement is factually verifiable; and (3) whether the "literary or social context signals that [the statement] has factual content." *Solaia Technology*, 852 N.E.2d at 840. "The test is restrictive: a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact." *Id.*, citing *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 208 (Ill. 1992). "[B]ut if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993), citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17–21 (1990).

Plaintiffs Freydin and his law firm point to "terrible experience," "awful customer service," and "don't waste your money" as examples of implied statements of fact contained in the reviews. We do not read them that way. First, the statements do not have precise and readily understood specific meanings. Granted, they are easily understood phrases in the English language. But there are numerous reasons why someone may have had a "terrible experience" or suggest that a product or service would be a "waste of money." Without additional details, the use of these phrases cannot be understood to be "precise." Cf. *Hopewell v. Vitullo*, 701 N.E.2d 99, 104 (Ill.

App. 1998) ("'[I]ncompetent' is an easily understood term, [but] its broad scope renders it lacking the necessary detail for it to have a precise and readily understood meaning.").

Second, none of the statements can be objectively verified as true or false. How could a third-party observer gauge whether the commentator received awful customer service, for instance, by just reading a one-star review that says "Terrible experience. Awful customer service"? What objective indicator defines whether a given customer service experience was good or bad? Or whether a service or good was worth the money? Cf. *Sullivan v. Conway*, 157 F.3d 1092, 1097 (7th Cir. 1998) ("It would be unmanageable to ask a court, in order to determine the validity of the defendants' defense of truth, to determine whether 'in fact' Sullivan is a poor lawyer."). This review, like the others, stated a non-actionable opinion.

More fundamental, we must consider the particular social context of these online reviews and what it may signal about their contents. The defendants posted their reviews on Freydin's Law Office's Facebook, Yelp, and Google pages, which invite unfiltered comments. We trust that readers of online reviews are skeptical about what they read, both positive and negative. But it is enough in this case that these short reviews did not purport to provide any factual foundation and were clearly meant to express the opinions of the defendants in response to Freydin's insults to Ukrainians generally.

Plaintiffs challenge this conclusion by arguing that the defendants' reviews falsely implied that the reviewers had actually used Freydin's legal services. In plaintiffs' view, leaving a review in these internet forums implies that the reviewer had a direct consumer relationship with the reviewee (or here, a client-lawyer interaction). To put it differently, plaintiffs

argue we should determine that a defendant did not actually receive "awful customer service" because she never received any services at all.

This approach conflicts with how courts typically think of libel per se claims. The point is not whether the individual commentator had a direct consumer relationship with the business that she reviewed. Rather, we ask if a reader could understand whether the reviewer was expressing opinions or facts. The comments in this case fall clearly on the side of opinion. There may be several reasons why someone had a bad experience with a business that have nothing to do with a direct-consumer relationship. Here, some of the defendants were responding to Freydin's personal Facebook posts and chose to express these views on his law office's pages. Next time it could be an opposing lawyer who chose to review Freydin in a negative light because of a bad experience against him in court. We do not see a reason why the comments from defendants in this case or the hypothetical opposing lawyer should be construed as actionable libel merely because they did not have a direct consumer relationship with Freydin or his firm (assuming the three opinion factors did not indicate otherwise).

Along this line, plaintiffs contend that "hypocrite," "chauvinist," and "racist" as used here by Chamara were not statements of opinion. We have explained why we view these reviews as statements of opinion. More generally, Illinois defamation law treats comments of this nature as actionable when based on identifiable conduct but as non-actionable when stated in general terms, without asserting specific factual support. See *Solaia Technology*, 852 N.E.2d at 841; *Pease v. International Union of Operating Engineers Local 150*, 567 N.E.2d 614,

619 (Ill. App. 1991); accord, *La Liberte v. Reid*, 966 F.3d 79, 93 (2d Cir. 2020) ("[A]ccusation[s] of concrete, wrongful conduct are actionable while general statements charging a person with being racist, unfair, or unjust are not." (internal quotation marks omitted)). "Hypocrite," "chauvinist," and "racist," as used in these reviews, fit squarely in the second category. Accordingly, these comments, like the others discussed above, are non-actionable statements of opinion.

Additional comments made by Chamara in her longer review are closer calls but are ultimately non-actionable opinion statements when analyzed in the correct context. As explained above, we consider the social context that these reviews appeared in to determine whether a reader would interpret the reviews as asserting opinions or facts. But the context analysis is two-fold: courts must also analyze the entirety of a review a comment appeared in to determine whether the reviewer expressed a factual assertion or opinion. Cf. *Solaia Technology*, 852 N.E.2d at 841 (analyzing the phrase "essentially worthless" in the context of the full letter where it appeared); *Flip Side, Inc. v. Chicago Tribune Co.*, 564 N.E.2d 1244, 1250 (Ill. App. 1990) ("[O]ne cannot select isolated sentences or statements out of an article or book in an attempt to create a claim for libel. The whole article or book, just as the entire episode in an episodic comic strip, must be viewed in order to determine the context of any statement that is made."). We cannot evaluate the defamatory nature of a word or phrase used in a review and determine whether the word or phrase is provably false on its own without considering the entire sentence and review in which it appeared.

An example from this case illustrates the importance of defining the scope of analysis correctly. Chamara's review of

Freydin included the line "he has no right to practice law."
Taken out of the context of the rest of the review, one might
find this statement to be falsifiable and actually false. No one
disputes that Freydin is a licensed attorney and has a legal
right to practice law. The full context, however, leads to a dif-
ferent conclusion about the nature of this comment. Here is
the full review from Chamara:

> David Freydin–is an embarrassment and a dis-
> grace to the US judicial system, he has no right
> to practice law. His unethical and derogatory
> comments, which target one particular nation–
> Ukrainians, show who he really is. He portrays
> himself as someone, who cares about the inter-
> ests of his clients, the majority of which happen
> to be Ukrainian, but in reality, he is a complete
> hypocrite, chauvinist and racist. He does not
> hide his hatred and disrespect towards the
> Ukrainian nation on his personal FB page. Such
> an attorney–is an embarrassment to any law
> firm.

In context, the statement "he has no right to practice law"
was the expression of an opinion. The lynchpin is what
"right" means in this phrase. Plaintiffs argue it refers to the
legal right to practice law, such as whether Freydin is a li-
censed attorney. But it could also easily be understood as re-
ferring to a moral right, such as whether he *should* be able to
practice law—a judgment about his values. Reading the re-
view as a whole, the "no right to practice law" comment
should not be interpreted as a reference to Freydin's legal sta-
tus as a member of the bar. The attack is on his values and
opinions. The comment is best understood as an expression

of Chamara's opinions about Freydin's values and opinions, not as a claim that he was practicing law without a license. She plainly was not "claiming to be in possession of objectively verifiable facts" regarding his licensure status. As Chamara wrote before and after the "no right" phrase, she believed Freydin was "an embarrassment and a disgrace to the US judicial system," and a "complete hypocrite, chauvinist and racist." This language signals that she was expressing a protected opinion about Freydin's values and moral right to practice law, not his legal right. The comment was a non-actionable opinion statement protected by the First Amendment.

Plaintiffs make a similar argument for Chamara's use of "unethical." They argue that "'unethical' carries a precise and understandable meaning which would subject the attorney to the discipline" of the Illinois Attorney Registration and Disciplinary Commission. That assertion overlooks the fact that "unethical" modified "comments" in the sentence: "[Freydin's] *unethical* and derogatory *comments*, which target one particular nation–Ukrainians, show who he really is." It strains logic to read "unethical" in this context as referring to whether Freydin was complying with the Rules of Professional Conduct enforced by Illinois bar authorities. Additionally, even if "unethical" was not in reference to Freydin's comments, "unethical" is surely meant in the ordinary context and as synonymous with immoral, nefarious, villainous, or vile. See *Unethical*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/unethical (last visited Jan. 26, 2022). In any event, the use of "unethical" here was a non-actionable expression of an opinion for the reasons discussed. Cf. *Gardner v. Senior Living Systems, Inc.*, 731 N.E.2d 350, 355 (Ill. App. 2000) ("Merely calling plaintiff 'unethical'

here [cannot] be reasonably interpreted as stating actual verifiable facts and therefore falls under a constitutionally protected opinion.").

Plaintiffs also contend that a one-star review is, by itself, defamatory. This would mean the one-star reviews by defendant Romenets and the unidentified John Does that contained only the review and no additional commentary amounted to defamation per se. We do not see how a one-star review conveys any objective fact that could be false or true. A person's rating reflects her own preferences, and preferences differ for many reasons. We assume that one-star ratings can cause substantial harm to a business. The power of a review does not change the fact, however, that there is no measuring tool to gauge the reliability of a one-star rating or a five-star rating. As we understand Illinois law on expressions of opinion, an unexplained one-star review simply could not be actionable as defamatory. Cf. *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269–70 (9th Cir. 2016) ("Even were we convinced that a one-star rating could be understood as defamatory—a premise we do not embrace ….."); *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 870–71 (8th Cir. 2005) (concluding that ratings are non-actionable opinion statements), abrogated on other grounds by *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, 773 F.3d 58 (8th Cir. 2014). Plaintiffs failed to state viable claims for relief under a theory of libel per se, and the district court properly dismissed this count of the complaint.

C.  *Civil Conspiracy Claims*

Plaintiffs also appeal the district court's dismissal of their civil conspiracy claims. Civil conspiracy "is not an independent tort." *Indeck North American Power Fund, L.P. v. Norweb*

*PLC*, 735 N.E.2d 649, 662 (Ill. App. 2000). When "a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails." *Id*. Since plaintiffs failed to state an independent cause of action underlying the alleged conspiracy, their civil conspiracy claims cannot stand on their own. We affirm the district court's dismissal of these claims.

IV. *Denial of Leave to Amend*

The district court also did not err in denying plaintiffs' request to amend their complaint after granting defendants' motion to dismiss. We review the denial of a motion to amend for an abuse of discretion. E.g., *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 524 (7th Cir. 2015). "The general rule is to freely permit plaintiffs to amend their complaint 'once as a matter of course.'" *Arlin-Golf, LLC v. Village of Arlington Heights*, 631 F.3d 818, 823 (7th Cir. 2011), quoting Fed. R. Civ. P. 15(a); see also *Runnion*, 786 F.3d at 518; *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1024 (7th Cir. 2013). The need for the generally "liberal amendment standard remains in the face of uncertain pleading standards after *Twombly* and *Iqbal*." *Runnion*, 786 F.3d at 523.

This general rule has its limits. District courts "may deny leave to amend … where there is a good reason to do so," such as "futility, undue delay, prejudice, or bad faith." *R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 946 (7th Cir. 2020) (internal quotation marks omitted). This discretion has its limits, too. An "'outright refusal to grant the leave without any justifying reason appearing for the denial,'" for example, "'is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules [of Civil Procedure].'" *O'Brien v. Village of Lincolnshire*, 955 F.3d

616, 629 (7th Cir. 2020), quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962).

When evaluating a decision not to permit an amended pleading, the analysis is not focused on only the district court's actions. We also consider whether the denial of leave to amend caused prejudice to the appellant. Showing prejudice ordinarily requires a party to show how she would have amended her pleading. And we expect that showing to be made at an early opportunity—in the district court, unless the court closed that door, and certainly no later than in an opening brief to this court. E.g., *Webb v. Frawley*, 906 F.3d 569, 582–83 (7th Cir. 2018) (losing plaintiff was "not entitled to leave to amend at this stage" after he failed to request leave to amend his complaint until it was too late). Failing to include an amended pleading, for example, "'may indicate a lack of diligence and good faith.'" *Arlin-Golf*, 631 F.3d at 823, quoting *Otto v. Variable Annuity Life Insurance Co.*, 814 F.2d 1127, 1139 (7th Cir. 1986). Delay also makes it difficult to "meaningfully assess whether [the plaintiff's] proposed amendment would have cured the deficiencies in the original pleading." *Crestview Village Apartments v. U.S. Dep't of Housing & Urban Development*, 383 F.3d 552, 558 (7th Cir. 2004); see also *James Cape & Sons Co. v. PCC Construction Co.*, 453 F.3d 396, 401 (7th Cir. 2006) ("District judges are not mind readers…. Even assuming that [plaintiff] properly moved to amend, the district court did not abuse its discretion in dismissing with prejudice, since it had no way of knowing what the proposed amendment entailed.").

Plaintiffs here never showed the district court how they thought they could amend their complaint to cure its deficiencies. Even in this court, plaintiffs also did not indicate in their

opening brief what they would have alleged in an amended complaint. Not until their reply brief did plaintiffs provide any concrete information. The reply brief on appeal is too late in the process to gain the benefit of the general permissive rule allowing one amended complaint as a matter of course. Considering this fact, any failure to provide adequate reasoning on the part of the district court did not amount to reversible error. E.g., *Pension Trust Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933, 942 (7th Cir. 2018) (though there were "problems with the district court's decision" denying plaintiffs' motion to amend, the court did not commit reversible error when plaintiffs failed to show what they would have included in their amended complaint in the district court or on appeal).

The judgment of the district court is AFFIRMED.